1              IN THE DISTRICT OF THE UNITED STATES OF AMERICA
                  FOR THE SOUTHERN DISTRICT OF ILLINOIS
2   _____
                                     )
3   **ROBERT T. GARRARD and**              )
    **WILLIAM JASPER,**                    )
4                                    )
                    Plaintiff(s),   )
5                                    )
       vs.                          )   Civil No. **11-824-GPM**
6                                    )
    **PIRELLI TIRE LLC,** *et al.*,        )
7                                    )
                    Defendant(s).   )
8   _____)

9

10                     **FINAL PRETRIAL MOTIONS**
                        DAY/VOLUME 1 OF 4

11    BE IT REMEMBERED AND CERTIFIED that heretofore on  **1/28/2013,**
      the same being one of the regular judicial days in and for the
12     United States District Court for the Southern District of
      Illinois, **Honorable G. Patrick Murphy,** United States District
13     Judge, presiding, the following proceedings were recorded by
       mechanical stenography; transcript produced by computer.
14
                              APPEARANCES:
15   *FOR PLAINTIFF GARRARD:*  **Bradley M. Lakin** of SL Chapman LLC, 330
     North Fourth Street, Suite 330, St. Louis, MO 63102 **and Robert**
16   **W. Schmieder, II** of Parker Law P.C, 2814 N. Center Street, P.O.
     Box 365, Maryville, IL 62062
17
     *FOR PLAINTIFF JASPER: Benjamin J. Willmann* and **David Gregory** of
18   Kodner, Watkins et al, 7800 Forsyth Boulevard, Suite 700,
     Clayton, MO 63105
19
     *FOR DEFENDANT:* **Peter Quendon Ezzell** of Law Offices of Peter Q.
20   Ezzell, 134 Westwind Mall, Marina del Rey, CA 90292 **and Anna Z.**
     **Krasinski** of Holland & Knight, LLP - Chicago, 131 South
21   Dearborn Street, 30th Floor, Chicago, IL 60603
22   *FOR COUNTERCLAIM OF MR. GARRARD:*  **Cheryl Callis** of Kortenhof
     McGlynn & Burns LLC, 1015 Locust Street , Suite 710, St. Louis,
23   MO 63101
24   *REPORTED BY:*  **Molly N. Clayton, RPR, FCRR,** Official Reporter
     for United States District Court, SDIL, 750 Missouri Ave., East
25   St. Louis, Illinois 62201, (618)482-9226,
                    *molly_clayton@ilsd.uscourts.gov*

```
 1              INDEX OF WITNESS EXAMINATION

 2                        DX      CX      R-DX     R-CX

 3    No witness testimony.

 4

 5                    INDEX OF EXHIBITS

 6    EXHIBIT              DESCRIPTION         Id'D      Rcv'd

 7    No exhibits identified or received.

 8

 9                      MISCELLANEOUS

10                                          PAGE

11    Jury instructions conference, formal    174

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          *COURTROOM DEPUTY:  Robert T. Garrard, et al. versus*

2    *Pirelli Tire LLC, et al.*, Case Number 11-824-GPM is called for

3    a final pretrial conference.

4          *THE COURT:*  Will the parties identify themselves for

5    the record?

6          *MR. LAKIN:*  Brad Lakin for Plaintiff Garrard.

7          *THE COURT:*  Mr. Lakin.

8          *MR. WILLMANN:*  Benjamin William for Plaintiff William

9    Jasper.

10         *THE COURT:*  Good morning.

11         *MS. CALLIS:*  Cheryl Callis on the counterclaim for

12   Mr. Garrard.

13         *THE COURT:*  Okay, on the counterclaim.  Are you with

14   the insurer?

15         *MS. CALLIS:*  I am, Judge, and we actually have a

16   motion to dismiss.

17         *THE COURT:*  I saw that.

18         *MS. CALLIS:*  Yes, sir.

19         *MR. SCHMIEDER:*  Good morning, your Honor, Rob

20   Schmieder on behalf of Plaintiff Garrard.

21         *MS. KRASINSKI:*  Anna Krasinski on behalf of the

22   Pirelli defendants.

23         *THE COURT:*  Ms. Krasinski.

24         *MR. EZZELL:*  Good morning, your Honor, Peter Ezzell

25   for the defendants.

1          THE COURT:  Now, Peter, I want to pronounce your name

2     correctly all through this trial.  So give it to me one more

3     time.

4          MR. EZZELL:  Ezzell.

5          THE COURT:  Ezzell.

6          MR. EZZELL:  Ezzell.

7          THE COURT:  Okay.  Now where is home for you folks?

8          MR. EZZELL:  Well, Los Angeles for me.

9          THE COURT:  Los Angeles.

10         MS. KRASINSKI:  Chicago.

11         THE COURT:  And Chicago.

12         MR. LAKIN:  At least he brought the weather.

13         MR. EZZELL:  Yeah, I did.

14         THE COURT:  All right.  As you know, we have a

15    presumptive trial set for the month of February, and it looks

16    like everyone has done what they need to do.  And we are going

17    to do it.  I anticipate starting on the 5th.  Where is Linda?

18         COURTROOM DEPUTY:  I'm right here.  I'm looking up

19    your calendar right now.

20         THE COURT:  Is that Monday or Tuesday?

21         COURTROOM DEPUTY:  Tuesday.

22         THE COURT:  We generally have sentencings.  Some of

23    you were in here earlier.  Every Monday we set those aside, and

24    we are going to start on the 5th.

25         Now, there are many things before the Court, so I

1    thought I would start tomorrow at eight and start considering

2    the defendant's objections to the plaintiffs' documents and try

3    to get as much of that out of the way and then probably then on

4    Wednesday do the same.

5         Now, there is one thing perhaps we can take care of

6    today, if we can.  You do have a motion for a good faith

7    settlement.  That's a particular procedure under Illinois law.

8    I don't know how familiar you are with it.  But it doesn't take

9    much to be in good faith.  If you wish to object, I can take

10   that up tomorrow morning first, and then, basically, it's a

11   matter of the settling parties to show that there was genuine

12   consideration given from one to the other.

13        Now, I really don't know much about this case except

14   what's in the papers.  But this was a suit between two people

15   on motorcycles.  Generally, their covering is very small.  It's

16   an unusual -- it's an unusual case.

17        Do you object, and do you wish to have a hearing on

18   that?

19        *MR. EZZELL:*  I object, but not to this portion of the

20   settlement, and let me explain so the Court can focus on it.

21        *THE COURT:*  Go ahead.

22        *MR. EZZELL:*  There was a state court action.  You may

23   have seen that.

24        *THE COURT:*  Yes.  I have read this.

25        *MR. EZZELL:*  And, indeed, what happened was, they

1   dismissed it without prejudice, entered into a tolling

2   agreement.

3              THE COURT:  Tolling agreement.

4        MR. EZZELL:  So that the statute, it does not run.

5              THE COURT:  Right.

6        MR. EZZELL:  And my understanding from speaking with

7   counsel this morning is two things.  Number 1, Mr. Willmann got

8   the entire policy, so $100,000, and we're entitled to that, as

9   I understand under Illinois law as a setoff under certain

10  circumstances.

11             THE COURT:  Yes.

12       MR. EZZELL:  But that's something you do if we are

13  all --

14             THE COURT:  At the end of things.

15       MR. EZZELL:  And I've looked -- you know, I always try

16  to myself with the law of the state.  And I understand that

17  good faith settlement doesn't take a whole lot in Illinois.

18             THE COURT:  Do you have something like that in

19  California?

20       MR. EZZELL:  We do.  We absolutely do.  And it wipes

21  out comparative negligence, based upon a non-written indemnity

22  agreement, what we call implied indemnity, which is probably

23  very similar to what you have here in Illinois.  What's left in

24  this case, because I asked counsel about it this morning, is

25  that Mr. Garrard still has a claim over and against Mr. Jasper,

1    even after this settlement took place.

2            MR. WILLMANN:  Well, not against Mr -- I don't mean to

3    interrupt.

4            THE COURT:  Let me hear Mr. Ezzell first.

5            MR. EZZELL:  Then I misunderstood.  I understood that

6    a portion of the claim in the state court tolled so that

7    there's no statute of limitations agreement has survived this

8    settlement.  And that's an important issue because if, indeed,

9    there is not a complete dismissal of the rights of the parties

10   back and forth against each other, it very well may affect a

11   number of things in this case, including admissibility of those

12   prior pleadings under certain circumstances.  So perhaps I

13   misunderstood what has survived, and we best ask counsel.

14           THE COURT:  Well, here's what we are going to do.

15   Yes, of course, unless we have an agreement here today on this

16   matter, I want a complete record of what is said to be a good

17   faith settlement.  So, someone from either of the plaintiffs,

18   whether it be defense counsel on the counterclaim or not,

19   counterclaim for contribution, tell me exactly what the terms

20   of the settlement are between the parties.

21           MS. CALLIS:  Judge, we settled on behalf of

22   Mr. Garrard, and we are paying the policy limits of his State

23   Farm insurance policy.

24           THE COURT:  Mr. Garrard is paying Mr. Jasper.

25           MS. CALLIS:  Mr. Jasper $100,000 pursuant to the

```
 1    policy limits of his policy with State Farm.  And in addition

 2    paying the taxable court costs from the first action, the

 3    underlying state court action.  And there will be a complete

 4    release executed by Mr. Jasper of Mr. Garrard of his -- any

 5    rights he might have against Mr. Garrard.

 6            THE COURT:  And, of course, this will contain the

 7    usual provision without admitting fault.

 8            MS. CALLIS:  Yes, sir.

 9            THE COURT:  And all claims that ever existed from the

10    beginning of time until this point in time.

11            MS. CALLIS:  Exactly.

12            THE COURT:  All right.

13            MR. EZZELL:  I'll stipulate that's in good faith.  So

14    counsel doesn't have to come out here again.

15            THE COURT:  So that takes care of that problem.

16            MR. EZZELL:  It takes care of it except to the

17    extent -- that takes care of the counterclaim with regards to

18    Mr. Garrard.

19            THE COURT:  Against Mr. Jasper.

20            MR. EZZELL:  Well my -- yes, but now we have Jasper

21    back against Garrard.

22            MS. CALLIS:  No, you have it backwards.

23            MR. EZZELL:  I'm sorry.

24            MR. WILLMANN:  It's pretty much on point, I guess,

25    with what he's saying, except for the fact that part of the
```

1    tolling agreement provided that they -- they're not coming back

2    after Mr. Jasper, so to speak.  It's the insurance policy that

3    Mr. Jasper has.  So just -- you know, so it's just $100,000,

4    none of Mr. Jasper's personal assets over and above that.

5          MR. EZZELL:  Different cause.

6          MR. WILLMANN:  As part of the tolling agreement,

7    that's been left open, and that wasn't a part of --

8          THE COURT:  But this release takes care of that.

9          MS. CALLIS:  This release just deals with Jasper's

10   claim against Garrard.

11         THE COURT:  Now Garrard still has a potential claim.

12         MR. WILLMANN:  Against Jasper as part of the earlier

13   state court case and the tolling agreement.

14         THE COURT:  Okay.  Well, then, but, of course, that

15   case hasn't -- that case is not in this case.

16         MR. WILLMANN:  Correct.

17         MS. CALLIS:  It's not an issue because there was no

18   counterclaim filed by defendants against Jasper for --

19         MR. WILLMANN:  Jasper is not.

20         THE COURT:  Ezzell, I think the way that would have to

21   work if that -- well, that is separate and distinct from the

22   good faith settlement here.

23         MR. EZZELL:  It is.

24         THE COURT:  And it is something that the Court really

25   can't deal with.

1          *MR. EZZELL:*  It is.

2          *THE COURT:*  This settlement is in good faith.

3          *MR. EZZELL:*  And we have so stipulated.

4          *THE COURT:*  Okay.

5          *MR. EZZELL:*  But I wanted to bring to the Court's

6    attention --

7          *THE COURT:*  All right.

8          *MR. EZZELL:*  -- before counsel departed, because I

9    don't want to keep her around here any extra time

10   unnecessarily, that the claim still exists out there because

11   that has an effect on -- may have an effect on --

12         *THE COURT:*  It may.

13         *MR. EZZELL:*  -- on admissibility.

14         *THE COURT:*  That may have something to do with bias.

15         *MR. EZZELL:*  It might very well.  So other than that,

16   we'll stipulate that Mr. Garrard's -- the carrier's payment of

17   $100,000 to Mr. Jasper, plus the little in the way of court

18   costs constitutes a good faith settlement between the two of

19   them in that direction.  Not back the other way.

20         *THE COURT:*  All right.  So that just leaves us now

21   with a straight-up case.

22         *MR. EZZELL:*  It does.

23         *THE COURT:*  Which makes it a lot easier for the jury.

24   Now --

25         *MR. EZZELL:*  It changes the instructions too so...

1           *THE COURT:*  Oh, sure.

2           Now, you are welcome to stay and listen to this

3    interesting discussion we are going to have, but you are not

4    required to.

5           *MS. CALLIS:*  Okay.  I had filed a proposed order.  Do

6    you...

7           *THE COURT:*  That order will be entered before the sun

8    sets today.

9           *MS. CALLIS:*  Awesome.

10          *THE COURT:*  And it will be in the -- as we always do

11   with our electronic filing system.

12          *MS. CALLIS:*  Thank you, Judge.  I know it will be

13   fascinating this morning, but I do think I'll go on and tend to

14   some other business.  But I appreciate your courtesy.

15          *THE COURT:*  That's kind of like getting a divorce.

16   You know, it's been fine, honey, but bye.

17          *MS. CALLIS:*  I'm outta here.

18          *THE COURT:*  Can't stand anymore of that.

19          Be careful when you go out on the street.

20          *MR. EZZELL:*  Speaking of divorce, last time I was here

21   to see you, you told me that your wife had told you that if you

22   didn't retire that there was going to be trouble, and I read

23   where you are retiring.

24          *THE COURT:*  I have about ten months left, guys, and

25   I'm going to give you the best I have here in the next few

1    weeks.  But the chances are if I don't do a good job, I will

2    not be the judge that gets it the next time, the next time

3    around.  Sometimes you have to do these things two or three

4    times to get it right.

5         MR. EZZELL:  Congratulations, your Honor.

6         In that same vein, my new wife, who is an attorney,

7    wanted me to convey to you that on Friday night we have the

8    ABOTA dinner dance for which she has bought a new dress, and if

9    I am not back in Los Angeles on Friday night to take her, she

10   wants to know if you know a good divorce lawyer.

11        THE COURT:  I do.  I do.  I do.  And those ABOTA

12   meetings are pretty good.  I try to attend them up here when I

13   can.

14        MR. EZZELL:  If we are still going, I may leave

15   Ms. Krasinski if that's all right with the Court.

16        THE COURT:  I'll bet she can take care of herself.

17        MR. EZZELL:  There you go.

18        THE COURT:  Ezzell, one of the greatest trial lawyers

19   that ever lived is a guy from Summerville, Georgia.  His name

20   is Bobby Lee Cook, and he tried over 300 murder cases.  And I

21   got to know Bobby well.  And he always objected when someone

22   wanted him to do a divorce case and refused them except in one

23   instance.  A woman kept coming back and pestering him to take

24   her case, and he kept explaining that he didn't do that.

25        Finally, the last time that she was there, she said,

1    "You don't understand, Mr. Cook."  And he said, "What is it I

2    don't understand?"  She said, "My husband is the chairman of

3    the Coca-Cola company."  And I said, "Bobby Lee, what did you

4    do?"  He said, "What did I do?  I looked to her and I said,

5    What did he do to you?"

6           There is a divorce lawyer out there for your wife.

7           MR. EZZELL:  Well, hopefully, we won't have to have

8    that conversation, your Honor, because I will be gone on

9    Thursday with this one way or the other.

10          THE COURT:  We'll see.

11          MR. EZZELL:  Thank you.

12          THE COURT:  Now, Mr. Lakin, when I sent out my order,

13   do you intend to try to persist in a negligence case?

14          MR. LAKIN:  No.  And we've already filed, I think, our

15   amended pleading cleaning that all up, I think, late -- was it

16   Thursday or Friday?

17          MR. SCHMIEDER:  I don't know.

18          MR. LAKIN:  If it hasn't been filed it will be today.

19          THE COURT:  Okay.  So we are working on --

20          MR. SCHMIEDER:  We are going to submit on --

21          THE COURT:  Strict liability.

22          Now, did everybody read my little memo on the

23   *Freislinger* case?  I sent it out in one of my orders.  The

24   Court of Appeals for the Seventh Circuit has an entirely

25   different understanding of comparative fault.  They -- there's

1    no requirement as the Seventh Circuit sees it that for purposes

2    of a products liability case that comparative fault rise to the

3    level of misuse or assumption of the risk.  Judge Wood spoke on

4    the issue twice.

5             And it's -- as I said, if you read it, whatever they

6    say, that's the way it is in my court.  And so you get a

7    general instruction just on comparative fault.

8             MR. EZZELL:  Right.  And Mr. Willmann told us out in

9    the hall this morning that he agreed to the comparative fault

10   instruction.  So I think we've got it knocked.

11            THE COURT:  Okay.

12            Well, that's going to help things immensely.  That's

13   an argument that's been had.  And *Freislinger* was one of Rex

14   Carr's cases tried in Benton.

15            MR. LAKIN:  Is that right?

16            THE COURT:  Uh-huh.  It was an explosion case, a gas

17   explosion.  He got $2 million the first time around, was

18   reversed, and came back and said he would have to have

19   4 million to settle it, because he said he had committed

20   malpractice the first time and didn't ask for punitive damages.

21   The jury came back and gave him the next time around.  So...

22            MR. EZZELL:  As is so often the case.

23            THE COURT:  Sometimes you get what you ask for, don't

24   you?

25            MR. EZZELL:  That's exactly right.

1        THE COURT:  Okay.  Now, what are some of the other

2   issues that we are going to have to deal with other than the

3   exhibits, the motions in limine, and the jury instructions?

4        MR. EZZELL:  There are --

5        THE COURT:  Mr. Ezzell.

6        MR. EZZELL:  There are no major ones that I'm aware

7   of.  There is an issue whether or not counsel gets to use

8   certain depositions, some of which -- some of which are in the

9   state court, which I understand for these purposes of direct

10  use, used by the plaintiff in their case, requires some showing

11  of unavailability.

12       THE COURT:  Well, you are under Rule 804, under the

13  unavailability section of 804, prior testimony between the same

14  parties, things like that.

15       MR. EZZELL:  Right.  And some of which, interestingly

16  enough, are transcripts which have not yet even been prepared.

17  We took -- I don't know whether you recall this, but about ten

18  days ago there was -- before you bucked over by your magistrate

19  the issue of whether or not certain depositions could be taken,

20  there were two that --

21       THE COURT:  Right.  As a matter of fact, and I said I

22  don't consider those discovery depositions, you are just taking

23  those for evidence purposes.

24       MR. EZZELL:  Correct.  May I -- are we going to use

25  first names?  I'm always uncomfortable using a first name to a

1    court.  Brad and I talked.  I think we have worked very well.

2         THE COURT:  I prefer that -- I prefer that you do.

3    You will find that in my court it's a lawyer's court.  I will

4    let you try your cases.  You don't both get to speak at the

5    same time or speak to each other.  There is a certain formality

6    that's necessary to maintain good order in the courtroom.  But

7    certainly if he is comfortable with you calling him Brad and

8    you are comfortable with him calling you whatever, Mr. Ezzell.

9         MR. EZZELL:  Peter.

10        THE COURT:  Peter.

11        That will be fine.  That will be fine with me.

12        MR. EZZELL:  Okay.  Brad and I spoke.  And Brad set

13   not two, but five depositions, though one of them I think never

14   got found, so we ended up with four depositions.  In the

15   instance of each one of those folks -- and, by the way,

16   Mr. Willmann took one and now has another one set forth

17   February 4th.  I objected.  And these doctors were not listed

18   under FRCP 26(E) under his experts in the case, and, therefore,

19   their testimony should be limited to their observations, their

20   diagnosis, and treatment, but not opinions.

21        And in each instance, Mr. Lakin, and later on

22   Mr. Willmann, stipulated to me that I could give that objection

23   once at the front end of the deposition and need not do it

24   again.  So there are a lot of opinions in there that I have

25   difficulty with.

1          *THE COURT:*  Here's what we will do.  Hopefully, we
2    will have time to take that up tomorrow.
3          *MR. EZZELL:*  Okay.
4          *THE COURT:*  Now, here's what I would like everyone to
5    know.  This Court follows the Federal Rules of Evidence and
6    Rule 26 and not the common law of Madison County or the common
7    law of Belleville or the common law of LA.
8          Now, there are a few things that we generally do
9    around here as a matter of convenience, particularly on
10   physicians.  I mean, the 150-mile rule applies like it does for
11   any other person, but we often use their depositions just so we
12   don't have to impede someone getting treatment that they might
13   otherwise need.
14         That is separate from your point.  What your point --
15         *MR. EZZELL:*  It is.
16         *THE COURT:*  -- is, is that -- and there is a Seventh
17   Circuit case on that -- when their treatment or when their
18   testimony goes beyond what a treating physician would give.
19   And that's Judge Kanne's case, and I can't remember the name of
20   the case, a Seventh Circuit judge -- they become a Rule 26
21   expert.  Sounds like that's what you are talking about.
22         *MR. EZZELL:*  It is.
23         *THE COURT:*  I won't prejudge it, but I'll take it up
24   tomorrow.
25         *MR. EZZELL:*  Okay.

1       THE COURT:  So what I'd like to do tomorrow then, is
2   everyone take a look at what your objections really are.  Okay.
3   I don't do this for exercise.  If you come in here tomorrow and
4   say, actually, we don't object to this and this and this, we
5   will just turn to the ones for which there is a real objection.
6           Then just -- I see somebody has got their evidence
7   manual here.  Just have it with you.  I'll be reading it all
8   tonight myself.  I go over these always.  Then we will go to
9   your objections as to what the deposition testimony can be used
10  and what can't.
11          So we got that.  What else?
12      MR. EZZELL:  Well, we are limited in that because the
13  transcripts haven't been prepared, or at least they haven't
14  been forwarded, except with one exception.
15      MS. KRASINSKI:  Two.
16      MR. EZZELL:  Two exceptions:  Dr. Rew, R-E-W [sic],
17  and Dr. Guss.
18          I'm sorry.  Dr. Pieck, P-I-E-C-K [sic].
19      MR. WILLMANN:  Do you have.
20      MR. EZZELL:  So at least two of them, we haven't even
21  seen the transcripts.
22      THE COURT:  You can't argue what you don't have, but
23  if you have something, we'll argue it.
24      MR. EZZELL:  Absolutely.  Absolutely.  And I'm not
25  aware.  I think we laid out everything given your order and

```
 1    your local order here that has come up with one possible
 2    exception.
 3            MS. KRASINSKI:  I think there is one exception.  I
 4    think Mr. Jasper has amended his damages theory after some of
 5    these physicians' depositions.
 6            MR. WILLMANN:  It was the day of Dr. Riew's
 7    disposition, and he testified as to future medical treatment
 8    that Mr. Jasper might need in the depo, which I wasn't aware he
 9    was going to testify to until he testified to it.
10            THE COURT:  Well, we will get to that.
11            MR. EZZELL:  Sure.
12            THE COURT:  Now, let's see if I understand this case.
13    We've tried a few motorcycle cases around here.  Your theory is
14    that the -- I guess this is the Victory.  Your client was
15    riding the Victory motorcycle?
16            MR. EZZELL:  He was.
17            MR. LAKIN:  Right.
18            THE COURT:  And the Victory has the Pirelli tire on
19    it?
20            MR. WILLMANN:  No.  My client -- sorry to interrupt,
21    Judge.
22            THE COURT:  The Yamaha.
23            MR. WILLMANN:  The Yamaha Raider.  The rear tire of
24    the Yamaha Raider had an alleged manufacturing defect.
25            THE COURT:  But what you say is actually the trailing
```

1  motorcycle crashed into the rear tire and caused the tire to

2  explode and crack the rim.

3       MR. EZZELL:  Exactly.

4       THE COURT:  Okay.  All right.  I got that in mind.

5       Our settling party that just got out kind of like took

6  a glancing shot from one of the motorcycles; is that right?

7       MR. EZZELL:  The settling party that got out was the

8  trailing motorcycle that ran right into the back of the -- and

9  there is no issue.  We all agree that, indeed, there was a

10  collision.

11       THE COURT:  There was a collision, no question about

12  that.

13       MR. LAKIN:  The chicken or the egg.

14       THE COURT:  Yeah.  You say the tire went down.

15       MR. LAKIN:  We say what the eyewitnesses say, which is

16  the tire blew, and he ran into them.

17       THE COURT:  All right.  I just want to be sure I'm

18  understanding what's -- there's three cases when you are a

19  trial judge.  There's the case that you get on just the

20  pleadings.  That's the first case.  There's the next case when

21  you get to like summary judgment and motions in limine and the

22  like.  And then there's the case when the witnesses come in

23  here and start testifying.

24       Now, by the time you get to the end of that case, it

25  often bears very little resemblance to the case that started

1  two years earlier on the papers.  We'll see.  I'm just trying

2  to understand what the parties are saying here, and I think

3  that I do.

4            Okay.  Now, are you going to try to prove up

5  impairment by alcohol in this case?

6            MR. EZZELL:  No.

7            THE COURT:  Okay.  I didn't think.

8            MR. EZZELL:  We had an answer to that in Dr. Riew's

9  deposition, and that was he had a .01, but obviously not --

10           MR. WILLMANN:  Not Dr. Riew's.

11           MR. EZZELL:  Dr. Peick.

12           THE COURT:  I think he should be given a medal.

13  There's some people I know that could never be found at .01.

14           MR. EZZELL:  But by the same token, and this will come

15  up later on, I don't want there to be a rewriting of history

16  here.  These folks, there is a part of it where they want to

17  cut out in limine that these folks went to Fast Eddie's.  And

18  there is an issue here that Mr. Garrard was a juvenile onset

19  diabetic.

20           THE COURT:  Well, we will have to get to that.  That's

21  why I set all this time aside so I can consider all these

22  things.

23           MR. LAKIN:  And on that issue, Judge, if I can just

24  clarify things.  I anticipated that his doctor would give an

25  opinion, based upon a reasonable degree of medical certainty,

 1   that the diabetic issue wasn't aggravated.  He did not so.

 2   That will not be an issue.

 3        THE COURT:  Does anybody here have any thinking on the

 4   subject of whether a reasonable degree of medical certainty has

 5   anything to do with the Federal Rules of Evidence or whether

 6   this is just a state creature.

 7        MR. EZZELL:  In California, it is a state creature.  I

 8   can't find anything that tells me that.  And then you get into

 9   this issue of what about reasonable degree of engineering

10   certainty or accountancy certainty.

11        THE COURT:  I -- if you -- if somebody here brings me

12   a case under the Federal Rules of Evidence applying Illinois

13   law that says something about a reasonable degree of medical

14   certainty, we will use that term.  In the absence of that or

15   some strong argument to the contrary, we will not, because I

16   can't find it.

17             And these are the Federal Rules of Evidence.

18        THE COURT:  Now, Peter is going to have to leave

19   Thursday.  I was kind of anticipating Friday, after we have a

20   swearing-in ceremony for our new Congressman, that we might,

21   unless I get to it earlier, have a conference on jury

22   instructions.  We are all going to do all those together, so I

23   will leave that to you.

24             Do you have some instructions for me to look at,

25   Mr. Lakin?

1          *MR. LAKIN:*  I have got them all right here.

2          *THE COURT:*  All right.  Good.

3          *MR. LAKIN:*  Quick question, Judge.  I assume, just so

4    that I'm clear on it, we have a case set to try on the 4th in

5    St. Clair County.  So I can inform judge Lopinot that we are

6    going to --

7          *THE COURT:*  You tell Judge Lopinot this is the only

8    time I can get this case, and I'm starting it when I am because

9    I have a case back from the Court of Appeals that we have to

10   try right after this.

11         *MR. LAKIN:*  We are the second case out.

12         *THE COURT:*  So just tell him please.  If he has a

13   problem, he can call me, and I will talk to Judge Lopinot if

14   need be.

15         *MR. LAKIN:*  Okay.

16         *THE COURT:*  Now, we have two defendants and we have

17   two plaintiffs, right?

18         *MR. EZZELL:*  Actually --

19         *MR. WILLMANN:*  We have one defendant.

20         *MR. EZZELL:*  -- my understanding is they are

21   dismissed.

22         *THE COURT:*  That's right.  You are dismissing that

23   case.

24         Now, your two defendants are substantially one.

25         *MR. EZZELL:*  They are going to dismiss.  My

1    understanding is that --

2         *THE COURT:*  Okay.

3         *MR. EZZELL:*  And it brings up an interesting issue

4    that we could talk about now or some other time because I know

5    this Court is very busy.  They are going to dismiss Pirelli

6    Tire LLC -- who never saw this tire, never had anything to do

7    with it.  It was an original equipment tire shipped directly

8    from Germany to Japan -- with prejudice.  And that's fine with

9    me.  But there's a whole bunch of other German entities that we

10   didn't argue about when we were in here because they were never

11   served, as I understand it, and I've only appeared for Pirelli

12   Tire and GmbH, the manufacturer of the tire.

13        *THE COURT:*  The failure to make process within 180

14   days are grounds for the Court to dismiss those.

15        *MR. EZZELL:*  Right.  And they proposed to dismiss

16   those folks without prejudice, and I want it over with.  I

17   don't want to be back here with a new judge another year from

18   now.  So I think that that stipulation would be agreeable to

19   me.

20        *THE COURT:*  You would have a stronger case on that if

21   you had entered your appearance for them.

22        *MR. EZZELL:*  Well, I would.  And they've never been

23   served, so I'll make a motion to dismiss.  They've never

24   appeared.  You know, that's the quandary we find ourselves in.

25   They're in that stipulation, but they were never served under

1    the Hague Convention and never appeared.

2         *THE COURT:*  You have 180 days, Brad.

3         *MR. LAKIN:*  I understand.

4         *THE COURT:*  Now, you make your motion now.

5         *MR. EZZELL:*  I move that the remaining defendants, the

6    German defendants, and there's a series of them set forth in

7    the proposed stipulation of dismissal, be dismissed.

8         *THE COURT:*  All of them.

9         *MR. EZZELL:*  Except Pirelli GmbH, the remaining

10   defendant.  The very last part of the stipulation proposes that

11   the only defendant to go to verdict in front of this Court

12   would be Pirelli GmbH, Pirelli Tire GmbH, the manufacturer.

13        *THE COURT:*  Do you wish to say anything, Mr. Lakin?

14        *MR. LAKIN:*  No, Judge, other than we are talking about

15   the remaining defendants.  For purposes of the record, we have

16   already dismissed Yamaha, previous defendant, and have the

17   right to reinstate in the future, if jurisdictional.

18        *THE COURT:*  Well, that's not my concern her.

19        *MR. LAKIN:*  I know.  I just wanted to clarify that he

20   was talking about the remaining defendants.

21        *THE COURT:*  Granted.

22        *MR. EZZELL:*  Thank you, your Honor.

23        *THE COURT:*  With prejudice.

24        *MR. EZZELL:*  Thank you.

25        *THE COURT:*  We will prepare an order.

1          *MS. KRASINSKI:*  The negligence claim requires some
2     sort of document to dismiss it, I think.
3          *THE COURT:*  Did you file some papers.
4          *MR. LAKIN:*  As I indicated, we either have filed or
5     will file.  I know we approved it Friday.  I'm not for sure if
6     we got it filed or not.
7          *THE COURT:*  As soon as I get something, I'll dismiss
8     the negligence claim.  As a practical matter, once I don't
9     instruct the jury on it, that's the end of it.
10         *MS. KRASINSKI:*  As a similar issue, we would request
11    that that be dismissed with prejudice as well.
12         *THE COURT:*  Well, think about it.  When we talk about
13    prejudice there, that would be subsumed in whatever judgment
14    there is.  But when you say with prejudice with claims against
15    the remaining party, that is, by definition, just a provisional
16    order until there is a final judgment.  There will be a final
17    judgment at the end of this case, so I'll just dismiss them.
18    And at the end of the case, it's done.  However --
19         *MR. EZZELL:*  And the statute is gone anyway.
20         *THE COURT:*  Yeah.
21         So we will take care of that.
22         It looks to the Court as if you should each get three
23    peremptory challenges.  You might want to take a look at what
24    the statutory challenges for cause are.  We very seldom get
25    those.  But occasionally you will.  You get to do voir dire.

1    There will be no political arguments, like do you listen to

2    Rush Limbaugh?  You know, do you think that the chamber of

3    commerce are really nice people?  Did you vote for George Bush?

4    Stuff like that.  Just talk to the jurors, and you will be fine

5    with me.  You try to get into a political discussions with my

6    jurors, you will have a problem.

7             MR. WILLMANN:  Judge, how does that work with both

8    sides of voir dire, that both plaintiffs get a chance to voir

9    dire, and will both plaintiffs get three peremptory challenges,

10   or is it --

11            THE COURT:  You get three on a side because you are

12   aligned.

13            MR. LAKIN:  Mmm hmm.

14            THE COURT:  Your interests are the same, really.  Now,

15   you can split them up however you want.  There is a rule on

16   that.  If you can't agree, I'll do it.

17            MR. EZZELL:  Any time limitations on voir dire, a

18   reasonable time?

19            THE COURT:  I'll tell you what, we almost never have a

20   problem.  The jurors get down here at 8:45.  We always have a

21   jury before noon.  It's just always.

22            MR. EZZELL:  Right.  And remind me, your Honor,

23   because it's been a while.  An eight-person jury is unanimous

24   or six?

25            THE COURT:  An eight-person, has to be unanimous, but

1    we only have to finish with six.  I may pick nine, for

2    instance, this time.  I may just get me an extra juror just in

3    case somebody -- for instance, I had a tire blowout this

4    morning about 5:00 in the morning driving up here, so that

5    would be a terrible thing if I had to mistry a case because

6    somebody couldn't finish up.

7            MR. EZZELL:  I have to ask because of the issue of

8    prejudice.  It wasn't a Pirelli, was it?

9            THE COURT:  No.  No.

10           MR. EZZELL:  Last time we were here, we talked about

11   Pirelli being the Formula 1 tires.

12           THE COURT:  Formula 1 tires, yeah.  I don't know that

13   they ever made a tire for a Ford F-150.

14           MR. EZZELL:  Sure.  It is called a Scorpion.

15           THE COURT:  Is it?

16           MR. EZZELL:  Oh, yeah.

17           THE COURT:  I didn't know that.

18           MR. EZZELL:  Never tried a case involving a Scorpion.

19           THE COURT:  I didn't know that.

20           Okay.  Well, what are some of the other things you

21   want me to be thinking about as I prepare tonight for this

22   case?

23           MR. EZZELL:  I went through the motions in limine on

24   the plane.  Some of them are really easy, like the issue of

25   whether the Court will instruct on taxation, which I read an

1    '09 decision out of this Court and several other decisions.  I

2    think one was the U.S. Supreme Court.  But I think that they're

3    all set forth in the motions in limine, which we have all been

4    opposed as to those which counsel can't agree upon.

5         *MS. KRASINSKI:*  I just have a practical question.

6    Because I understand you guys are going to be filing a new

7    complaint.  Are you going to -- planning on merging this into a

8    pretrial order, or how do you want us to address our existing

9    counterclaims, things like that?

10        *THE COURT:*  Prepare your instructions.

11        *MS. KRASINSKI:*  Just prepare the instructions.

12        *THE COURT:*  I'm not one on busy work.

13        *MS. KRASINSKI:*  That's fine.  Some judges like us to

14   do that.

15        *THE COURT:*  You know what, Rule 26 is pretty complete.

16   I would say it is complete.

17        *MR. EZZELL:*  Yeah.

18        *THE COURT:*  And once you get your list of witnesses

19   and documents, and once I've ruled on all the issues of law,

20   and we know what the ground rules are, we are ready -- we are

21   ready to go.

22        Now, we've got Peter and we've got Brad.  You are the

23   only female here.  I take it that your mother gave you a name,

24   too.

25        *MS. KRASINSKI:*  Anna.

1          *THE COURT:*  Anna.  Okay, Anna.

2          *MR. EZZELL:*  I would not want to discriminate under

3     any circumstances.  And Anna will take a number of the

4     witnesses.

5          *THE COURT:*  I've got ten months.  There is still the

6     Supreme Court.  You never know what could happen.

7          *MR. EZZELL:*  You never do.

8          Now, one thing maybe we could talk about, it is not

9     particularly substantive.

10          *THE COURT:*  Right.

11          *MR. EZZELL:*  And that is, if we start on Tuesday, pick

12     a jury, give opening statements maybe even on Tuesday

13     afternoon, how long do Mr. -- Brad and Ben expect their case to

14     take because we --

15          *THE COURT:*  Well, listen, we are going to go until

16     4:30 every day.  You have to get out of here at 4:30 for

17     reasons you surely understand.  I take it you guys are staying

18     across the river.

19          *MR. EZZELL:*  We are.

20          *THE COURT:*  Okay.  And it's just a good idea to get

21     out of here.

22          You know, on most -- you know on most products cases,

23     they shouldn't take too long.  What, do you anticipate having

24     your case put on by Thursday, probably finish Thursday morning?

25          *MR. LAKIN:*  When would we actually start with

1  witnesses?

2       *THE COURT:*  Tuesday afternoon.

3       *MR. LAKIN:*  So, yeah, Thursday or Friday morning.

4       *THE COURT:*  And then --

5       *MR. LAKIN:*  I mean, we're going to move as quick as we

6  can.

7       *THE COURT:*  I know you will.  He's tried a case in our

8  court.  He doesn't waste any time.

9       *MR. EZZELL:*  And I don't either.  And I've got witness

10  problems with regards to one of the witnesses.  He needs to get

11  on and off by the 7th or 8th.

12       *MS. KRASINSKI:*  He is available on the 11th, too.

13       *MR. EZZELL:*  That's true.  Now, that does create

14  another issue.

15       *THE COURT:*  The 11th is what day?

16       *MR. EZZELL:*  The 11th is.

17       *COURTROOM DEPUTY:*  Monday, it is a Monday.

18       *THE COURT:*  Now I cleared Monday off, didn't I?

19       *COURTROOM DEPUTY:*  No.

20       *THE COURT:*  I didn't?

21       *COURTROOM DEPUTY:*  We set aside four days.

22       *THE COURT:*  To go over, we would have to go on the

23  12th.  If we don't get done, we will have to finish up on the

24  12th.  We get these sentencings in that we just -- we have to

25  deal with them.

1          MR. EZZELL:  And I don't think that's a problem.  And
2    probably if the way things, as I appreciate it, will go, my
3    last witness would be on the 12th.
4          Now, if it goes that far.  He very well may be on the
5    8th if that's a Friday.
6          THE COURT:  Mmm hmm.
7          MR. EZZELL:  Now, the witness who I have the
8    difficulty with, who has to get on the 7th or the 8th, because
9    he won't go on on the 11th, because that's a heavy day for this
10   Court, is the one whose subject to that partial Daubert motion
11   that Mr. Willmann filed.  And we filed, we filed a lot of
12   opposition to that.
13         THE COURT:  So you need an answer to that.  Maybe we
14   can take care of that Wednesday and see how that's going to go.
15         MR. EZZELL:  Excellent.  Thank you, your Honor.  Yeah.
16         If you needed life testimony from Mr. DiTallo.
17         THE COURT:  I don't.
18         MR. EZZELL:  We have an issue.
19         THE COURT:  I won't.
20         MR. EZZELL:  Excellent.  Okay.  That's the only thing
21   I can think of.
22         How do you like the peremptories?
23         THE COURT:  Well, what we will do is, we will fill the
24   box up.  There's -- what do we have in there, 18?
25         COURTROOM DEPUTY:  We have 18 in there.

1          *THE COURT:*  How many?

2          *COURTROOM DEPUTY:*  Eighteen.

3          *THE COURT:*  Eighteen.

4          And once we've all talked to them, I'll have them go

5     out, and then you start exercising your peremptory challenges.

6     Now, here's how we do that.  The plaintiff always goes first on

7     odd numbered jurors, one, three, five, to infinity.  The

8     defense always goes first on two, four, six, eight, to

9     infinity.  Do you see what I'm saying?

10         *MR. EZZELL:*  I do.

11         *THE COURT:*  So, for instance, he may say as to Juror

12    Number 1 I accept.  Then you can either say, I accept or

13    challenge or exercise a peremptory.  In either case, Juror

14    Number 2, I'm going to look to you first, and you are going to

15    say.

16         *MR. EZZELL:*  Now, that raises an interesting issue,

17    which is different in the different circuits.  He then dings

18    Juror Number 3 on a peremptory challenge.  I believe that

19    changes the way the jury is presently constituted because I've

20    seen 2 and 3 out there talking in the hall.  Am I allowed to

21    double-back and get two, or is it now set in stone?

22         *THE COURT:*  It is set in stone.

23         *MR. EZZELL:*  Okay.

24         *THE COURT:*  As a practical matter, it is not going to

25    be a problem because they are going to be outside, and you are

1    going to be in here.  And you are going to -- we will go

2    through all 18 of them.  So out of that 18, you know, we will

3    probably get four or five jurors, and then the others go home.

4              MR. EZZELL:  Right.

5              Have you ever seen the way Texas does it?

6              THE COURT:  No.  But I know people in Texas, and it

7    would be an interesting experience.

8              MR. EZZELL:  They -- you do them simultaneously, and

9    it ends up -- and you do them secretly, so you just do them by

10   number, and you hand them to the judge.  And every time I've

11   ever seen it done, both sides ding the same person.

12             THE COURT:  Well, I always remind my Texas friends

13   that they got their behinds kicked at the Alamo.

14             MR. EZZELL:  That's true.

15             THE COURT:  I just don't think that would have

16   happened if it had been people from Illinois.

17             MR. EZZELL:  Or Marines.

18             THE COURT:  Ain't no question about that.  They would

19   have surrendered outside the gates.

20             MR. EZZELL:  That's correct.

21             THE COURT:  Okay.  What else?

22             Okay.  I'll see everybody at 8:00 in the morning.

23             MR. EZZELL:  What time do we start with the jury,

24   8:00?

25             THE COURT:  Well, I want you here at 8:00.  The

1  jury -- the jurors will get up here at about 8:45, but I can go

2  over some things then and make sure.

3

4                              -oOo-

5                      REPORTER'S CERTIFICATE

6      I, Molly N. Clayton, RPR, FCRR, Official Court Reporter
   for the U.S. District Court, Southern District of Illinois, do
7  hereby certify that I reported with mechanical stenography the
   proceedings contained in pages 1 - 35; and that the same is a
8  full, true, correct and complete transcript from the record of
   proceedings in the above-entitled matter.

9

10                DATED this 24th day of March, 2012.

11

                              s/Molly Clayton, RPR, FCRR
12                      _____

13

14

15

16

17

18

19

20

21

22

23

24

25